**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HOLLIDAY, | |
| *Plaintiff,* | Civil Action No. 13-1006 (JMV) |
| v. | **OPINION** |
| CITY OF ELIZABETH, et al., | |
| *Defendants.* | |

**John Michael Vazquez, U.S.D.J.**

This case arises from an incident outside a nightclub in Elizabeth, New Jersey in the early morning of January 9, 2012. Plaintiff Nakiki Holliday ("Plaintiff" or "Holliday") brings this matter against Defendant City of Elizabeth, New Jersey ("Elizabeth"), Elizabeth Chief of Police Patrick Shannon ("Shannon"), and Elizabeth police officers Carrie Scharpnick ("Scharpnick"), Grisel Arias ("Arias"), Franklin Banos ("Banos"), Alexander Blanco ("Blanco"), and John Does 1-10 (collectively, "Defendants"). All named Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. D.E. 71, 72, 74, 75, 76, 78. Defendants Scharpnick, Shannon, and City of Elizabeth also request the Court bar Plaintiff's expert report. D.E. 74, 75. The Court reviewed all submissions,[1] and considered the motions without oral

---

[1] In this Opinion, Plaintiff's Complaint (D.E. 1) will be referred to as "Compl." Defendants' briefs in support of their motions for summary judgment will be referred to as "Banos Br." (D.E. 71), "Scharpnick Br." (D.E. 75), "Arias Br." (D.E. 76), "Blanco Br." (D.E. 78), and "City & Shannon Br." (D.E. 75). Plaintiff's brief in opposition (D.E. 86) will be referred to as "Pl. Opp. Br." Defendants' briefs filed in reply will be referred to as "Banos Reply" (D.E. 89), "Scharpnick Reply" (D.E. 90), "City & Shannon Reply" (D.E. 91), "Blanco Reply" (D.E. 92), and "Arias Reply" (D.E. 95).

argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, the motions for summary judgment made by Defendants Arias, Banos, Blanco, Shannon, and Elizabeth are **GRANTED**. Defendant Scharpnick's motion for summary judgment is **GRANTED** in part and **DENIED** in part. Defendant Scharpnick's request to bar Plaintiff's expert report is **GRANTED**. Defendants Shannon and City of Elizabeth's requests to bar Plaintiff's expert report are dismissed as moot.

## I. BACKGROUND

As an initial matter, the briefing in this case, including the parties' statements of material facts, did not provide the Court much help in deciphering either the differing accounts of what happened in the early morning of January 9, 2017 or the legal issues presented in this case. Therefore, the Court had to conduct a detailed review of the summary judgment record in order to have an accurate view of the disputes and the related factual contentions. The Court summarizes Plaintiff's account, followed by the accounts of Plaintiff's boyfriend, Rafael Boone, and Plaintiff's friends Coretta Johnson, Cierra Mitchell, and Gary Lewis. The Court then turns to the accounts of Defendants Scharpnick, Arias, Banos, and Blanco. Lastly, the Court summarizes Plaintiff's expert report from Richard Rivera.

Plaintiff's Account

The following account by Plaintiff is not in dispute. On the evening of January 8, 2012 and into the early morning of January 9, 2012, Plaintiff and friends were at the Dolce Lounge in Elizabeth, New Jersey to celebrate Plaintiff's birthday. D.E. 86, Exhibit A, Deposition of Nakiki Holliday ("Holliday Dep."), 11:10-12:13. When Plaintiff arrived at the Dolce Lounge between 11:30 P.M. and 12:00 A.M., she observed that there were approximately 200 people in the venue. Holliday Dep., 15:2-15:5, 21:24-22:1. About 40 minutes after Holliday arrived, a fight broke out

2

and the venue shut down by stopping the music and turning on the lights. *Id.* at 24:18-32:04. Holliday heard other people state that someone had been stabbed. *Id.* at 24:18-25:01. At this point, Plaintiff left the Dolce Lounge through the front door in order to get her coat check ticket from her friend Gary Lewis, who was already outside. *Id.* at 33:06-35:04. Plaintiff then observed Lewis in a crowd of people and thought that Lewis was involved in some sort of fight. *Id.* at 36:3-36:11. Plaintiff moved towards the crowd to determine what was happening. *Id.* at 37:07-38:01, 38:04-34:07. After seeing Lewis, Plaintiff began yelling "what's going on, what's going on" as she tried to get through the crowd. *Id.* at 39:01-39:05.

At this point, Plaintiff and Defendants' accounts begin to differ in important respects. Plaintiff claims that as she began yelling, someone grabbed her right arm. *Id.* at 39:21-39:24, 41:11-13. Plaintiff did not initially know who was grabbing her and she pulled herself away. *Id.* at 41:14-41:20. Plaintiff claims that as she turned around to see who had grabbed her, she was immediately punched in the face by a fist. *Id.* at 41:21-23. Plaintiff recounts that she then raised her right arm up in front of her face and she was "hit repeatedly in my head by two other people." *Id.* at 41:24-42:10. Plaintiff stated that it "felt like I was getting jumped." *Id.* at 45:04. Plaintiff indicates that she was then thrown to the ground while hearing a police officer yell "get down on the ground." *Id.* at 45:23-46:14. Plaintiff admitted that she briefly resisted the police officer's attempt to throw her on the ground because she believed that she (Plaintiff) "didn't have to be thrown to the ground." *Id.* at 47:03-47:15. Plaintiff claims that a police officer kicked her on the back, forcing her face to hit the ground, and then the police officer placed the officer's knee into her back while continuing to say "get on the ground." *Id.* at 47:16-49:12. Plaintiff states she was handcuffed and "an officer came down and maced me in my eyes and then put two fingers into my left eye." *Id.* at 50:06-50:13. Holliday was then taken away in a police car. *Id.* at 54:22-55:07.

Of note, Plaintiff's account is different than the facts alleged in her Complaint. While Plaintiff clearly testified that the incident occurred outside the Dolce Lounge while she was checking on Lewis, she alleged in her Complaint that she was assaulted while waiting for a friend at the coat check. Compl. at 3. Moreover, in her moving papers, Plaintiff also attempts to expand the Complaint's substantive factual allegations concerning excessive force. Plaintiff claims that the officers intentionally drove in a reckless manner while transporting her back to the station and that one officer then tripped her after they arrived. These assertions are utterly absent from her Complaint.

Rafael Boone's Account

When Boone was outside the club, he observed Plaintiff standing and being "tossed around by cops." D.E. 86, Exhibit B, Deposition of Rafael Boone ("Boone Dep."), 21:06-21:18. He recounts that he "saw the lady officer trying to slam" Plaintiff and that the officer "had her arm and shoulder, arm, wrist and shoulder, and the next thing you know the guy cops came, and there was a heavy-set guy, cop, white guy." Id. at 22:10-22:19. Boone stated that it looked like the officer "was trying to fight" Plaintiff, id. at 23:18-23:19, and that the female officer punched Plaintiff in the back of the head, id. at 45:22-46:13, 48:12-48:15. Boone contends that the male officer, whom he describes as "a big guy, probably 230 pounds, tall," was trying to take out Plaintiff's legs. Id. at 24:20-25:01. Boone claims that at this point, the female officer, along with the other officers, struck the Plaintiff after she was taken to the ground—including kneeing her in the back. Id. at 25:15-27:24. However, Boone also offered a different version, stating that he "didn't see the female officer strike [Plaintiff] when she was down. I saw the male officer strike [Plaintiff] when she was down." Id. at 47:22-47:24. Boone then observed another large white male officer mace Plaintiff in the face while she was on the ground. Id. at 28:21-29:07. Boone

never heard the female officer instruct Plaintiff to get on the ground or inform Plaintiff that she was under arrest. *Id.* at 43:24-44:04.

Correta Johnson Account

Johnson testified that she observed two female police officers (one white) with the Plaintiff. D.E. 86, Exhibit C, Deposition of Correta Johnson ("Johnson Dep."), 24:21-25:04 ("One was black, one was white, I believe. I'm not sure, she could have been Puerto Rican, but she was light and one was dark-skinned."). Johnson observed the white female officer and the Plaintiff in a physical altercation and watched as the Plaintiff was brought to the ground. *Id.* at 25:07-25:19. However, Johnson does not recall which female officer brought Plaintiff to the ground, *id.* at 25:22-26:18, but does recall that Plaintiff was lifted up and slammed to the ground by one of the officers, *id.* at 29:24-30:03. Once on the ground, Johnson claims that the female officers were "like hitting [Plaintiff] and stuff and pulling her arms back to arrest her. I don't know. To me, it was doing a little bit too much extra stuff. . . . To me, it wasn't all necessary." *Id.* at 29:02-29:07.

Gary Lewis' Account

Lewis recounts that when he was on ground outside the club, the officers had Plaintiff on the ground and a male officer was "hitting her or something, hitting her with something. I don't know if it was with something or what. There was a couple of them." D.E. 86, Exhibit D, Deposition of Gary Lewis ("Lewis Dep."), 25:16-25:21. Lewis stated that he did not see any female officers interacting with Plaintiff. *Id.* at 26:15-26:20.

Cierra Mitchell Account

When Mitchell left the club, she observed "a Hispanic cop . . . [and] a Caucasian cop, she had blond hair." D.E. 86, Exhibit E, Deposition of Cierra Mitchell ("Mitchell Dep."), at 34:02-34:03. Mitchell recounts that the Plaintiff was lying on the ground with a bloody nose, *id.* at 33:12-

33:21, as a result of the white female officer hitting Plaintiff in the face as she lay face-down on the ground, causing Plaintiff's nose to bleed, *id.* at 34:10-34:23. Mitchell observed the white female officer, a Hispanic male officer, a heavy-set white officer, and a short white officer. *Id.* at 35:23-37:05. Mitchell did not see any officers use any spray while Plaintiff was on the ground. *Id.* at 37:21-37:25. Mitchell claims that Plaintiff was then brought to a police car, and the heavy-set male officer sprayed Plaintiff while she was being placed in the vehicle because Plaintiff was being verbally abusive to the officers. *Id.* at 39:20-43:10. Mitchell later observed an officer trip Plaintiff at the police station. *Id.* at 56:08:56:17.

Carrie Scharpnick's Account

Defendant Scharpnick has a different account of the events. On the night of the incident, Scharpnick was on duty. D.E. 86, Exhibit F, Deposition of Carrie Scharpnick ("Scharpnick Dep."), 24:07-24:16. Scharpnick was at Elizabeth Police headquarters when a call came over the police radio reporting a stabbing at Dolce Lounge. *Id.* at 25:24-26:02. Scharpnick and her partner, Defendant Arias, responded. *Id.* at 31:16-32:17. Scharpnick and other officers tried to clear patrons out of the club through the front entrance. *Id.* at 48:15-48:22. While still inside the club, Scharpnick observed multiple fights taking place outside. *Id.* at 58:16-59:19. Once outside, Scharpnick observed officers arresting a subject and a surrounding group of people yelling "why he's getting arrested[?]" *Id.* at 62:07-64:12. Scharpnick claims she repeatedly ordered the crowd to leave the area or else they would be arrested, including a specific order to Plaintiff. *Id.* at 65:20-66:10, 66:25-67:01.

When the crowd, including Plaintiff, did not disburse, Scharpnick claims she told Plaintiff she was under arrest and instructed Plaintiff to put her hands behind her back. *Id.* at 66:23-67:18. Scharpnick claims that Plaintiff disregarded Scharpnick's orders, so Scharpnick grabbed

Plaintiff's right arm handcuff her. *Id.* at 67:21-68:13. Then Scharpnick claims that Plaintiff tried to pull away and struck Scharpnick on the left shoulder. *Id.* at 68:15-69:07. Scharpnick states that she then punched Plaintiff in the mouth one or two times. *Id.* at 69:09-69:22. Scharpnick claims Plaintiff then grabbed Scharpnick's hair, pulled her hair down so that Scharpnick was in a bent over position and tried to knee Scharpnick in the face. *Id.* at 69:24-73:20.

## Grisel Arias' Account

Arias drove Scharpnick to the scene and eventually attempted to clear the club. D.E. 86, Exhibit H, Deposition of Grisel Arias ("Arias Dep."), 14:02-14:21, 22:03-23:12. When she went outside the club, Arias claims that she observed that Plaintiff had grabbed Scharpnick by her hair and that Scharpnick was in a bent over position. *Id.* at 25:12-25:22, 27:10-27:12. Arias then tried to pull Plaintiff away from Scharpnick and eventually helped Scharpnick handcuff Plaintiff. *Id.* at 27:13-28:23. Arias claims she did not converse with Plaintiff at any point after she was placed in the police car. *Id.* at 33:03-33:19.

## Alexander Blanco's Account

Blanco and Defendant Banos were partners and responded to Dolce Lounge in the early morning of January 9, 2012. D.E. 86, Exhibit J, Deposition of Alexander Blanco ("Blanco Dep."), 12:19-14:19. Both Blanco and Banos were dressed in plain clothes. *Id.* at 14:11. Blanco testified that he did not see anyone arrest Plaintiff. *Id.* at 16:01-16:06. He also stated that he did not see Plaintiff, nor use any force, including spray, in any interaction with Plaintiff. *Id.* at 18:01-18:07, 38:15-38:23. Blanco later spoke to Scharpnick at police headquarters and Scharpnick was "holding a lock of her hair which had been torn off from her head." *Id.* at 19:17-19:20.

While Blanco did not recall anything about the ride back to headquarters from the club, *id.* at 20:20-21:09, Blanco admitted that he reported at the time that "we transported both Sierra and Nakiki to police headquarters," *id.* at 20:22-21:06.

Franklin Banos' Account

Banos testified that he did not see Plaintiff at all on January 9, 2012. D.E. 86, Exhibit I, Deposition of Franklin Banos ("Banos Dep."), 30:01-30:03. Banos also stated that he did not observe any confrontation between Plaintiff and Defendant Scharpnick. *Id.* at 27:09-29:15, 30:04-30:06. However, later in his deposition, Banos stated that he observed Scharpnick walk Plaintiff to his vehicle and place Plaintiff in the back of his police car. *Id.* at 31:11-39:15. Defendant Blanco then drove the police car with Plaintiff in the rear, with Defendant Banos riding passenger, to the police station. *Id.* at 39:16-40:05.

Plaintiff's Criminal Charges

Following her arrest, Plaintiff was charged with violations of (1) N.J.S.A. 2C:29-1, obstructing the administration of law, (2) N.J.S.A. 2C:33-2a, disorderly conduct, (3) N.J.S.A. 2C:29-2a, resisting arrest, and (4) N.J.S.A. 2C:11-1b(5)a, assault on a police officer. Def. Scharpnick SOMF ¶ 38; Pl. Response to Def. Scharpnick SOMF. All charges were ultimately dismissed because Scharpnick failed to appear in court.[2] Def. Scharpnick SOMF ¶ 39; Pl. Response to Def. Scharpnick SOMF.

---

[2] Scharpnick testified that she did not attend consecutive court hearings because the "[f]irst time, I was sick, and the next time, I was dealing with my father who was sick with cancer." Scharpnick Dep. 92:19-92:22. Scharpnick failed to provide prior notice to the court of either absence. *Id.* at 92:23-93:05.

<u>Training in Use of Force and Disciplinary History</u>

In response to Plaintiff's interrogatory asking what training the officers received with respect to use of force, Defendants Banos, Blanco, and Scharpnick each responded that they attended the John H. Stammler Police Academy for use of force training. D.E. 75-5, Ex. D, F, H. Each officer also stated that he/she attended biannual use of force training. *Id.* at Ex. D, F, H, J. Defendant Scharpnick additionally attended "Controlled Force I and II" training at the John Stammler Police Academy. *Id.* at Ex. H.

The parties contend that Defendant Scharpnick has had either one or two excessive force complaints filed against her. See Pl. Opp. at 21 ("Defendant Scharpnick has been the subject of 2 Internal Affairs complaints in a 2 year period, both of which were Excessive Force Complaints."); Defs. City of Elizabeth & Shannon Reply at 3 ("Prior to January 9, 2012, Officer Scharpnick . . . had only one other internal affairs complaint against her").

## II. PROCEDURAL HISTORY

Plaintiff filed her Complaint on February 20, 2013. D.E. 1. On March 13, 2014, Judge Salas dismissed Counts 8, 10, and 11 from Plaintiff's Complaint with prejudice. D.E. 21. Plaintiff's remaining claims are brought pursuant to 42 U.S.C. § 1983 ("Section 1983") and N.J.S.A. 10:6-1, *et seq.* (the "New Jersey Civil Rights Act" or "NJCRA"): Count One alleges use of excessive force pursuant to Section 1983 against Defendants Scharpnick, Arias, Banos, Blanco, and/or John Does 1-5; Count Two alleges failure to intervene pursuant to Section 1983 against Defendants Scharpnick, Arias, Banos, Blanco, and/or John Does 1-5; Count Three alleges false arrest and false imprisonment pursuant to Section 1983 against Defendants Scharpnick, Arias, Banos, Blanco, and/or John Does 1-5; Count Four alleges malicious prosecution pursuant to Section 1983 against Defendants Scharpnick, Arias, Banos, Blanco, and/or John Does 1-5; Count

Five alleges Supervisory liability pursuant to Section 1983 against Defendants John Does 6-10; Count Six alleges unlawful policy, custom, practice, and inadequate training pursuant to Section 1983 against Defendants City of Elizabeth, Patrick Shannon and/or John Does 6-10; Count Seven seeks prospective injunctive relief pursuant to Section 1983 against Defendants City of Elizabeth, Shannon, Scharpnick, Arias, Banos, Blanco, John Does 1-10; and Count Nine alleges violations of the New Jersey Civil Rights Act against Defendants Scharpnick, Arias, Banos, Blanco, and/or John Does 1-5.

On March 28, 2017, Defendant Franklin Banos filed a motion for summary judgment. D.E. 71. On March 31, 2017, Defendants Carrie Scharpnick (D.E. 74), Grisel Arias (D.E. 76), Alexander Blanco (D.E. 78), City of Elizabeth (D.E. 75), and Patrick Shannon (D.E. 75) filed motions for summary judgment. On May 15, 2017, Plaintiff filed a brief in opposition to Defendants' motions for summary judgment, D.E. 86, to which Defendants Banos (D.E. 89), Scharpnick (D.E. 90), City of Elizabeth (D.E. 91), Shannon (D.E. 91), Blanco (D.E. 92), and Arias (D.E. 95) replied.

### III. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving

party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV. ANALYSIS

At the outset, Plaintiff acknowledges that her claims for false arrest and malicious prosecution (Counts Three, Four, and portions of Count Nine) are only applicable to Defendant

Scharpnick. Pl. Opp. Br. at 1. As a result, the Court dismisses those claims as to all other Defendants. The Court first examines Plaintiff's remaining claims against Individual Defendants Banos, Blanco, Arias, and Scharpnick. Then, the Court turns to Plaintiff's *Monell* claims against Defendant City of Elizabeth and Defendant Shannon. Finally, the Court reviews Defendants Scharpnick, Shannon, and City of Elizabeth's motions concerning Plaintiff's expert witness.

### a. Plaintiff's Claims Against Individual Officers

#### 1. Section 1983

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). In order to state a claim under Section 1983, a plaintiff must demonstrate that "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015).

Plaintiff alleges violations of the Fourth Amendment, as applied to Defendants by way of the Fourteenth Amendment. "The Fourth Amendment, which protects persons from 'unreasonable searches and seizures' prohibits false arrest, false imprisonment, illegal search and seizure, and the use of excessive force.'" *Roman v. City of Newark*, No. 16-1110, 2017 WL 436251, at *3 (D.N.J. Jan. 31, 2017) (quoting U.S. Const. amend. IV). Reasonableness under the Fourth Amendment

"depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 618 (1988) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 619 (quotation marks and citation omitted).

"The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." *Couden v. Duffy*, 446 F. 3d 483, 496 (3d Cir. 2006). In assessing the validity of an excessive force claim, a court must determine the objective reasonableness of the alleged conduct. *Id.* A court should pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Groman*, 47 F.3d at 634 (quoting *Graham*, 490 U.S. at 396). Courts may also consider the following:

> [T]he possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). When more than one officer is sued on a Fourth Amendment excessive force claim, the district court must evaluate each officer's liability separately. *See Kaucher v. Cty. of Bucks*, 455 F.3d 418, n.7 (3d Cir. 2006) ("In order to prevail on a [Section] 1983 claim against multiple defendants, a plaintiff must show that *each* individual defendant violated his constitutional rights." (emphasis added) (quoting *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005))).

As to failure to intervene, "[c]ourts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force[.]" *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (internal quotation omitted). The officer, however, must have a "realistic and reasonable opportunity to intervene" in order to be held liable. *Id.* at 651; *see Bryant v. City of Philadelphia*, 890 F. Supp. 2d 591, 601 (E.D. Pa. 2012), *aff'd* (Mar. 15, 2013) (finding that "if a police officer is present when another officer violates a citizen's constitutional rights, the first officer is liable under § 1983 if that officer had reason to know that a constitutional violation, such as excessive force, was being used, and that officer had a reasonable and realistic opportunity to intervene" (internal quotation omitted)).

Turning to false arrest, "[a]n arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983." *O'Connor v. City of Philadelphia*, 233 F. App'x 161, 164 (3d Cir. 2007) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). Additionally, "where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Id.* (citing *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995)). "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). In determining whether a police officer had probable cause to arrest, a court must review the totality of the circumstances of the events leading up to the arrest and must do so from the "standpoint of an objectively reasonable police officer[.]" *Id.* (citation omitted).

As to malicious prosecution under Section 1983, a plaintiff must prove the following:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated

the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014) (citing *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)).

### 2. NJCRA

The New Jersey Civil Rights Act ("NJCRA"), provides a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2. The "NJCRA was modeled after § 1983, [and so] 'courts in New Jersey have consistently looked at claims under the NJCRA through the lens of § 1983' and 'have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart.'" *Velez v. Fuentes*, No. No. 15-6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016) (quoting *Samoles v. Lacey Twp.*, No. 12–3066, 2014 WL 2602251, at *15 (D.N.J. June 11, 2014) (internal quotation marks omitted)); *see, e.g.*, *Waselik v. Twp. of Sparta*, No. 16-4969, 2017 WL 2213148, at *8 n.15 (D.N.J. May 18, 2017) (citing cases) (noting that the court had "not seen in the case law any indication that malicious prosecution is an exception to the general principle that NJCRA is construed in parallel to § 1983.").

### 3. Qualified Immunity

In Section 1983 suits, "[q]ualified immunity shields government officials from personal liability for civil damages insofar as their conduct does not violate *clearly established* statutory or

constitutional rights of which a reasonable person would have known." *Paszkowski v. Roxbury Twp. Police Dep't*, No. 13-7088, 2014 WL 346548, at *2 (D.N.J. Jan. 30, 2014) (emphasis added). A court must engage in a two-part inquiry to determine whether qualified immunity applies: (1) whether the allegations, taken in the light most favorable to the party asserting the injury, show that defendant's conduct violated a constitutional right and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts have the discretion to consider either prong of the two-part analysis first. *Id.* at 236. The Supreme Court has ruled that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "To make that determination, [a court should] engage in another reasonableness inquiry: 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Santini v. Fuentes*, 795 F.3d 410, 417–18 (3d Cir. 2015) (quoting *Saucier*, 533 U.S. at 202). This analysis is "undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201.

"The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). Generally, a court must view the facts in the light most favorable to the plaintiff. *Id.* at 326; *see Scott v. Harris*, 550 U.S. 372, 378 (2007) (finding that when the parties' versions of the facts differ substantially at summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," and therefore, in "qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." (internal quotations, citations, and brackets omitted)). Qualified immunity is "an immunity from suit rather than a mere defense to liability"

so it is "effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Accordingly, qualified immunity "is considered at the earliest possible stage of proceedings, apart from the analysis of the underlying claim itself." *Giles*, 571 F.3d at 325–26.

Defendants Banos and Blanco

Plaintiff brings claims pursuant to Section 1983 against Defendant Banos and Defendant Blanco alleging excessive force, and failure to intervene, as well as claims pursuant to the NJCRA for excessive force. The Court finds that Banos and Blanco are entitled to summary because Plaintiff has not provided sufficient testimony or other evidence create a genuine issue of material fact to preclude summary judgment.

Because Plaintiff provides almost no information about Banos and Blanco's actions, the Court considers the testimony of Banos and Blanco as generally uncontested facts. Neither Plaintiff nor any of Plaintiff's witnesses identify either officer. Instead, Plaintiff's evidence attempts to distinguish the identities of the male officers with general descriptions such as "male," "Hispanic," "white," "short," or "heavy-set." However, Plaintiff has failed to show how these general descriptions apply to either Banos or Blanco. There is simply no adequate description of either Banos or Blanco from which a jury could draw the reasonable inference that either officer exercised any excessive force on Plaintiff. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) ("A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."). Similarly, Plaintiff points to no evidence that either Banos or Blanco was the specific officer that sprayed Plaintiff with mace or tripped Plaintiff in the police headquarters. *See* Mitchell Dep. 55:06-56:17. Plaintiff

does not point to sufficient evidence identifying either officer from which a jury could draw a reasonable inference that either Banos or Blanco acted improperly. Also, importantly, the situation outside the Dolce Lounge did not merely involve the named officer Defendants. Instead, there were numerous Elizabeth police officers who responded in light of the hundreds of persons present. By comparison, both Banos and Blanco's unrefuted testimony demonstrates that neither touched Plaintiff on the night in question nor sprayed her with mace. Plaintiff fails to raise any issue of material fact as to her Fourth Amendment excessive force claims against Banos and Blanco. Therefore, Banos and Blanco are entitled to summary judgment on Count One's claim for excessive force.

For similar reasons, summary judgment is also appropriate on Count Two against Banos and Blanco. Again, both officers' unrefuted testimony is that neither was aware of Plaintiff's altercation with other officers and, as a result, neither was in a position to intervene. The testimony shows that Banos was acting as a lookout and that neither Banos nor Blanco observed any confrontation between Plaintiff and Defendant Scharpnick. *See* Banos Deposition 27:09-29:15, 30:04-30:06. As with the excessive force claim, no witness for Plaintiff can identify either Banos or Blanco with any degree of certainty. The witnesses' general descriptions do not provide enough information to provide a genuine issue of material fact. In fact, when asked about what actions Plaintiff claims Banos and Blanco took that evening, Plaintiff responded that she did not know what either Defendant did to her. Holliday Dep. 67:24-68:07. In fact, Plaintiff's brief makes clear that she has insufficient evidence as to either officer, arguing that "either" Banos or Blanco could be found liable. *See* Pl. Opp. Br. at 5. But the Court will not permit a jury to guess or speculate based on insufficient evidence. Banos and Blanco are granted summary judgment on Count Two's claim of failure to intervene.

Because Count Seven and Nine rely on the same underlying allegations of excessive force and failure to intervene, Defendants Banos and Blanco's motion for summary judgment as to those counts is similarly granted. Therefore, Defendants Banos and Blanco are granted summary judgment on the entirety of the remaining counts against them.

Defendant Arias

Plaintiff brings the same claims against Arias as she did concerning Banos and Blanco. The Court finds that Arias is entitled to summary judgment on the remaining counts. Again, Plaintiff provides insufficient evidence to raise a genuine issue of material fact precluding summary judgment. Viewing the facts in a light most favorable to Plaintiff, the Court finds that Plaintiff points to no evidence that Defendant Arias violated any of her constitutional rights.

Arias did not notice the interaction between Scharpnick and Plaintiff until Plaintiff already had Scharpnick by the hair. At that point, Arias assisted Defendant Scharpnick in handcuffing Plaintiff, but claims that she did not punch or knock Plaintiff to the ground. Arias Dep. 28:07-29:25. Plaintiff admits that she does not know what actions are attributable to Arias and even misidentifies Arias' gender. When asked "How about Grisel Arias, do you know what she did that evening or he did?" Plaintiff responded: "No." Holliday Dep. 68:8-68:10. Later in her deposition, Plaintiff is asked "So what are you alleging Officer Arias supposedly did to you?" Holliday Dep. 102:06-102:07. Plaintiff responded: "I'm pretty sure *he* was the one that drove me to processing, and I'm pretty sure *he* was the one that threw me on the ground in back where I was being processed." Holliday Dep. 102:06-102:11 (emphases added). Because Plaintiff raises no genuine issue of material fact as to whether Arias violated any of Plaintiff's constitutional rights, Arias is entitled to summary judgment on all remaining claims against her.

<u>Defendant Scharpnick</u>

Six counts remain as to Defendant Scharpnick: excessive force pursuant to Section 1983 (Count One), failure to intervene pursuant to Section 1983 (Count Two), false arrest and false imprisonment pursuant to Section 1983 (Count Three), malicious prosecution pursuant to Section 1983 (Count Four), injunctive relief pursuant to Section 1983 (Count Seven), and violations of the NJCRA (Count Nine). Scharpnick argues that she is entitled to summary judgment based on qualified immunity. Viewing the facts before the Court in a light most favorable to Plaintiff, there remain genuine issues of material fact that preclude summary judgment except as to the failure to intervene counts. The failure to intervene counts, Count Two and part of Count Nine, are dismissed because Plaintiff alleges that Scharpnick was the (or an) officer using excessive force. Plaintiff has presented the Court with no authority, nor could the Court find any, indicating that a police officer allegedly using excessive force is also liable under a theory of failure to intervene by not stopping herself.

At least as to the initial confrontation between Plaintiff and Scharpnick, there are genuine issues of material fact as to what occurred. Plaintiff recounts that someone grabbed her by her left bicep and that she pulled away because she did not know who grabbed her. Holliday Dep. 39:21-39:24, 41:11-41:13, 41:14-41:20. Plaintiff claims that she did not hear Scharpnick's command to disburse or face arrest, did not hear Scharpnick indicate that she was under arrest, and did not know that a police officer had grabbed her. There is no dispute that at the time, there were a large number of people amassed outside the lounge and the atmosphere was not one of tranquility. After being grabbed, Plaintiff claims she turned around to see who had gripped her when she was immediately punched in the face. *Id.* at 41:21-41:23. Even then, Plaintiff indicates that she did not know it was a police officer at first. *Id.* at 46:19-46:14. Plaintiff then claims she was hit repeatedly in the head

20

by two other people and then thrown to the ground and first heard what she recognized to be a police officer yelling "get down on the ground." *Id.* at 45:23-46:14 (recounting that "when I was thrown to the ground, I heard 'Get down on the ground,' like a cop. That's the only time I heard like a cop."). Plaintiff admits that she briefly resisted an officer's attempt to throw her on the ground because she believed she "didn't have to be thrown to the ground." *Id.* at 47:03-47:15. Plaintiff then recounts a police officer kicked her on the back, forcing her face to hit the ground, and then Plaintiff claims the police officer placed their knee into her back while continuing to say "get on the ground." *Id.* at 47:16-49:12. Plaintiff then states she was handcuffed and "an officer came down and maced me in my eyes and then put two fingers into my left eye." *Id.* at 50:06-50:13.

On the other hand, Scharpnick claims Plaintiff was the initial aggressor after failing to follow the officer's lawful order. Scharpnick reports that she repeatedly ordered the crowd of people to leave the area or else they would be placed under arrest, including a specific order to Plaintiff. Scharpnick Dep., 65:20-66:10, 66:25-67:01. When Plaintiff did not leave, Scharpnick claims that she informed Plaintiff she was under arrest and told Plaintiff to put her hands behind her back. *Id.* at 66:23-67:18. At this point, Scharpnick states that Plaintiff disregarded Scharpnick's orders and Scharpnick grabbed Plaintiff's right arm to place her in handcuffs. *Id.* at 67:21-68:13. Scharpnick states that Plaintiff then tried to pull away and struck Scharpnick on the left shoulder. *Id.* at 68:15-69:07. Scharpnick admits that, as a result, she punched Plaintiff in the mouth one or two times. *Id.* at 69:09-69:22. Scharpnick testified that Plaintiff then grabbed Scharpnick's hair and pulled her hair down so that Scharpnick was in a bent over position and tried to knee Scharpnick in the face. *Id.* at 69:24-73:20.

The other witnesses fail to provide a narrative consistent with either Plaintiff or Scharpnick's version. For example, Rafael Boone recounted that he "saw the lady officer trying to slam" Plaintiff and that the officer "had her arm and shoulder, arm, wrist and shoulder, and the next thing you know the guy cops came, and there was a heavy-set guy, cop, white guy." Boone Dep., 22:10-22:19. Boone added that the female officer punched Plaintiff in the back of the head. *Id*. at 45:22-46:13, 48:12-48:15. Cierra Mitchell first saw Plaintiff when she was already on the ground, and recalls that while Plaintiff was face-up on the ground, a female officer punched her in the face, causing her nose to bleed. Mitchell Dep., at 33:12-33:21, 34:10-34:23.

The factual disputes as to what happened during the initial interaction between Plaintiff and Defendant Scharpnick preclude summary judgment. If Plaintiff's version is believed, then she was not resisting arrest initially because she did not know that a police officer had grabbed her after informing Plaintiff that she was under arrest. Moreover, to the extent Plaintiff was trying to relieve herself from the grasp, her actions would have been reasonable if she did not know that it was a police officer who had a hold of her arm. At that point, Scharpnick would not have been justified in using any force against Plaintiff, much less one or two punches to the face. Again assuming Plaintiff's version, Plaintiff was not committing any offense, was not an immediate threat to the safety of Scharpnick, and was not attempting to flee. Thus, the excessive force count stands. Similarly, to the extent the charges against Plaintiff were based on this initial interaction, there would not have been probable cause to arrest or charge Plaintiff. As to the malicious prosecution claim, Plaintiff's criminal case ultimately resolved in her favor. Plaintiff's charges were dismissed after Scharpnick failed to appear in court.

On the other hand, if Scharpnick is credited, then she gave Plaintiff a lawful order – to leave or be arrested – which Plaintiff willfully disobeyed. At that point, Scharpnick would have

had probable cause to place Plaintiff under arrest. When Scharpnick then attempted to arrest Plaintiff, and Plaintiff pulled away and hit the officer, Scharpnick would have had probable cause as to resisting arrest and assaulting an officer. Scharpnick would have also been justified in taking reasonable measures to effect the arrest.

Scharpnick's also argues that she is entitled to qualified immunity. At the outset, the Court notes that violations of the Fourth Amendment based on excessive force, false arrest, and malicious prosecution are clearly established. Indeed, Elizabeth points to evidence that Scharpnick received continuous training as to the appropriate use of force. Given the record and the genuine issues of material fact, the Court cannot conclude at the summary judgment stage that Scharpnick is entitled to qualified immunity. The Court can imagine a scenario in which Scharpnick mistakenly but reasonably believed that her actions were appropriate. For example, Scharpnick may have informed Plaintiff that she had to disburse or face arrest and may have reasonably believed that Plaintiff heard her, when Plaintiff in fact did not (due to general noise and pandemonium at the scene). But to make such a finding, the Court would have to credit Scharpnick's testimony and discredit Plaintiff's version, which is not the appropriate role of the Court at the summary judgment stage. Moreover, the reasonableness of Scharpnick's use of force, at least during the initial encounter, is open to dispute. In other words, if Plaintiff merely pulled away from Scharpnick's grasp (and did not hit Scharpnick), then Scharpnick would not have been justified in punching Plaintiff in the face.

For the foregoing reasons, the Court denies Scharpnick's motion for summary judgment except as to failure to intervene, which is Count Two and part of Count Nine.

**b. Plaintiff's Claims Against Defendant City of Elizabeth and Defendant Shannon**

Two counts remain as to Elizabeth and Chief Shannon: *Monell* liability for the alleged excessive force against Defendant pursuant to an unlawful policy, custom, or practice, and inadequate training pursuant to Section 1983 (Count Six) and injunctive relief pursuant to Section 1983 (Count Seven). Elizabeth and Shannon argue that there are no genuine issues of material fact so that they are entitled to summary judgment. Plaintiff argues that "genuine issues of material fact exist as to whether plaintiff's injuries were proximately caused by deliberate indifference to unconstitutional policies, practices and/or procedures existing within Defendant City of Elizabeth Police Department, and/or whether the training regimen adopted by the Department with respect to excessive force is adequate." Pl. Opp. at 17. Plaintiff primarily relies on an expert report compiled by Richard Rivera. Plaintiff contends that Rivera's report shows that the Elizabeth Police Department failed to adequately train its officers and had a policy, practice, and custom of allowing excessive force. The Court has already granted Defendants Arias, Banos, and Blanco summary judgment. Therefore, the only remaining inquiry as to Elizabeth and Shannon are their actions vis-à-vis Scharpnick.

While a municipality may be liable under Section 1983, it cannot be held liable under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). "A municipality may only be held liable under § 1983 if the plaintiff identifies a municipal 'policy' or 'custom' that was the 'moving force' behind the injury." *Jewell v. Ridley Twp.*, 497 F. App'x 182, 185 (3d Cir. 2012) (quoting *Monell*, 436 U.S. at 694). "In other words, the plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation." *Noble v. City of Camden*, 112 F. Supp. 3d 208, 221 (D.N.J. 2015) (internal citation omitted). "A plaintiff

may show the existence of a *policy* when a decision-maker with final authority issues an official proclamation, policy, or edict. . . . [A *c]ustom* may be established by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (emphases added) (internal quotations and citations omitted).

Concerning appropriate training, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989) ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . . *Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary* to demonstrate deliberate indifference for purposes of failure to train." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (emphasis added) (internal quotations, citations, and brackets omitted).[3]

Additionally, a plaintiff must show that the unlawful policy or custom was the proximate cause of the plaintiff's injuries. The United States Supreme Court has observed the following as to proximate cause:

---

[3] "[I]n certain situations, the need for training can be said to be so obvious, that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (internal quotations omitted) (citing *Canton*, 489 U.S. at 390 n.10). These "single-incident" failure to train cases are, however, rare. "Liability in single-incident cases depends on the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Thomas*, 749 F.3d at 223–24 (internal quotation, citation, and bracket omitted). Here, Plaintiff has not argued the "single-incident" theory of liability.

> As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997); *see also Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

A police department may have an otherwise adequate policy or practice, or an otherwise sufficient training program, but may nevertheless still fall constitutionally short if it fails to recognize the deficiencies of a particular officer. As noted, the department or its superiors are generally charged with notice of an individual officer's shortcomings based on the officer's "pattern of similar constitutional violations[.]" *Thomas*, 749 F.3d at 223. For example, in *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996), the Third Circuit noted five excessive force complaints in five years against one officer. Because those five complaints were "in a narrow period of time and . . . of similar nature, a reasonable jury could have inferred that the Chief of Police knew, or should have known, of [the officer's] propensity for violence when making arrests." *Id.* at 974. Similarly, in *Worrall v. City of Atl. City*, No. CIV. 11-3750, 2013 WL 4500583 (D.N.J. Aug. 20, 2013), an officer "was the subject of twenty-one complaints. . . . Of the twenty-one, fifteen complaints are characterized as having involved either excessive force or some level of assault." *Id.* at *3. The number of complaints and the similarity of the allegation sufficiently put the department on notice of the officer's potentially unconstitutional behavior. In *Noble*, the court denied summary judgment when the plaintiff presented evidence that two officer defendants who had accumulated 19 excessive force complaints "had been flagged for monitoring and

supervision . . . and that past complaints against the officers had not been timely or properly investigated." 112 F. Supp. 3d at 224.

Here, the parties claim, without any citation, that Defendant Scharpnick has had either one or two excessive force complaints filed against her. See Pl. Opp. at 21 ("Defendant Scharpnick has been the subject of 2 Internal Affairs complaints in a 2 year period, both of which were Excessive Force Complaints."); Defs. City of Elizabeth & Shannon Reply at 3 ("Prior to January 9, 2012, Officer Scharpnick . . . had only one other internal affairs complaint against her"). Plaintiff does not dispute that Scharpnick received training at the academy, and twice a year thereafter, as to the permissible use of force. In fact, Plaintiff's own expert admits that the department "relied on an Attorney General approved, on-hour semi-annual classroom training course." D.E. 86-5, Exhibit S ("Rivera Report") at ¶ 153.[4] Effective September 1, 2000, the Elizabeth Police Department adopted the "New Jersey Use of Force Policy For All New Jersey Law Enforcement Officers" developed by the New Jersey Attorney General's Office. D.E. 75-5, Ex. K.

Even assuming that Plaintiff is correct that there were two excessive force complaints against Scharpnick in a two-year period, Plaintiff fails to describe the contents of the complaints against Scharpnick or explain why the complaints should have been handled differently. See Merman v. City of Camden, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) ("Isolated and without further context, however, statistical evidence alone may not justify a jury's finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers. Rather than reciting

---

[4] Rivera, however, contends that the classroom training "is not plausible and does not reflect state-of art police training." Rivera Report at ¶ 153. Rivera concludes, in part, that "[t]he lack of reality-based police work training by Elizabeth Police Departments [sic] contributed to the unnecessary arrest and injuries sustained by Nakiki Holliday." Id. at ¶ 156.

a number of complaints or offenses, a Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one." (internal quotations and citations omitted)). Critically, no court has found that two complaints over a two-year period present sufficient evidence of a potential pattern of improper conduct to result in potential liability to either a department or its supervising officers. Plaintiff fails to identify any genuine issues of material fact that could give rise to a showing of a policy, practice, or custom that proximately caused Plaintiff's alleged constitutional harms specifically caused by Defendant Scharpnick. Similarly, Plaintiff offers insufficient evidence that Elizabeth and Shannon inadequately trained Scharpnick.

In sum, even when construing the evidence presented in a light most favorable to Plaintiff, summary judgment is still appropriate for Elizabeth and Shannon, vis-à-vis Scharpnick, on a (1) policy, practice, or custom theory or (2) a failure to train theory.

### c. Plaintiff's Expert Report[5]

As an initial matter, Plaintiff's expert Richard Rivera's conclusions as to Defendants Banos, Blanco, Arias, Shannon, and Elizabeth are moot because the Court has granted summary judgment to those Defendants on all counts. This leaves the Court to determine whether Rivera's conclusions related to the remaining counts against Defendant Scharpnick are admissible at trial. Defendant Scharpnick argues that the Rivera Report should be excluded under Federal Rule of Evidence 702. Scharpnick Br. at 16-19. Plaintiff responds that Rivera's report provides reliable and valuable opinions regarding police procedures that will assist a jury.

---

[5] The Court describes this motion as the parties' did, that is, a motion to exclude the expert's report. Such reports, however, are generally inadmissible hearsay. The Court is actually determining whether the expert will be permitted, consistent with his report, to testify at trial.

"Under the Federal Rules of Evidence, it is the role of the trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 "has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). The Third Circuit has observed that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider*, 320 F.3d at 404 (citations omitted). The Third Circuit has described the three requirements as follows:

> *Qualification* refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert. Secondly, the testimony must be *reliable*; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his on her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, Rule 702 requires that the expert testimony must *fit* the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that Rule 702's helpfulness standard

requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003 (emphases added)

(internal quotations and citations omitted).

Rule 704 states:

> (a) In General--Not Automatically Objectionable. An opinion is not objectionable just because it embraces an ultimate issue.
> (b) Exception. In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

"While Rule 704 allows experts to provide an opinion about the "ultimate issue" in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards." *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013). Experts may not opine on "what the law required" or "testify as to the governing law." *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir. 1991). "This prohibition on experts testifying as to their own legal conclusions is so well established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle. In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." *Holman Enterprises v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) (citations omitted).

As to these remaining counts, the Court finds that Rivera essentially assumes the role the jury by deciding which facts to credit as reliable, assumes the role of the Court by opining on the relevant legal standards, and then opines on the correct application of those facts to the law. Rivera improperly invades the province of both the jury and the Court. His testimony as to Scharpnick is therefore inadmissible.

Rivera's report first recounted police reports and testimony from police officers and witnesses. D.E. 86-5, Exhibit S ("Rivera Report") at ¶¶ 17-51. Rivera then provided what he calls his "Standards Analysis, Observations, and Opinions." *Id.* at ¶¶ 52-168. Rivera qualified this analysis by stating that:

> *In my review of material in this and any litigation, it is not my role, not do I assess credibility of parties and witnesses.* I study the material and formulate opinions based on the totality of the information, my training, specialized experiences, skills, and education, then develop a theory while eliminating alternate theories. *My impartial theory was weighed against alternate theories presumptively giving the police officers in this matter all inferences as to their veracity, training, supervision, policies, practices and customs.*

*Id.* at ¶ 52 (emphasis added). Yet, despite this disclaimer, the Court finds that Rivera repeatedly made credibility determinations and then, using the evidence that he deemed credible, formed conclusions about the application of legal standards to the facts. For example, after describing the conflicting testimony of the witnesses, Rivera stated:

> A reasonable officer similarly situated to Scharpnick would not have initiated a force incident based on Scharpnick's account. Scharpnick over-reacted to Holliday's reported 'contempt of cop' that over-reaction included punching someone in the face in front of potentially hundreds of onlookers in what could have caused a volatile situation for police.

*Id.* at ¶ 144. However, it is clear that Rivera discounted Scharpnick's own account. Rivera first described Scharpnick's testimony in the following manner: "Holliday became 'belligerent and combative' according to Scharpnick, then pulled her arm away from Scharpnick punching Scharpnick in the left shoulder. . . . Scharpnick's punches to Holliday's face were jabs, 'just enough to stun her so I can grab control of her hands and placed her under arrest.'" *Id.* at ¶¶ 41, 43. Yet, Rivera later concluded that "[t]he motion described by both Scharpnick and Holliday when Holliday pulled or 'snatched' away *did not constitute an intentional 'strike' or punch upon*

*officer Scharpnick.*" *Id.* at ¶ 140 (emphasis added). To reach his conclusion, Rivera clearly credited Plaintiff's version of events over Scharpnick's recollection. In other words, Rivera recognized that Scharpnick's claim that Plaintiff punched her, but later determined that Plaintiff's strike did not constitute an intentional punch. Whether Plaintiff punched Scharpnick or not is for the jury to decide, not Rivera.

Rivera also made numerous legal conclusions. For example, Rivera summarized his findings, in part, as follows:

- The use of physical force on Nakiki Holliday was excessive and unjustified;

- Ms. Holliday's arrest was unjustified and lacked the initial, necessary probable cause;

- Other officers present failed to intervene in the use of excessive force used upon Holliday;

- Elizabeth police officers, including Officers Scharpnick, Arias, Blanco and Banos were not adequately supervised;

- Elizabeth police officers, including Officers Scharpnick, Arias, Blanco and Banos were not adequately trained;

- The failures of the Elizabeth Police Department Internal Affairs Division to impartially, thoroughly and in a timely manner, investigate allegations of excessive force prior to Nakiki Holliday's arrest allowed Elizabeth Police officers who engage in excessive force to do so with impunity;

- The City of Elizabeth, through its police supervisors, maintained and approved policies, customs, practices and procedures that accepted the regular misuse of force by its police officers, including the officers involved in Ms. Holliday's arrest;

- The City of Elizabeth and its Police Department's deliberate indifference to an knowledge and approval of these policies, practices, customs and procedures is shown in how the Department does not follow the New Jersey Attorney General's Guidelines for Internal Affairs Policy and

32

> Procedures and the Attorney General's Guidelines for Use
> of Force.

*Id.* at ¶ 15. He also made similar findings at the end of his report. *Id.* at pp. 53-54. To reach such

legal conclusions, Rivera first improperly acted as a fact-finder. As noted in the summary

judgment section above, there is insufficient evidence to hold Arias, Banos, and Blanco liable.

Yet, despite this lack of evidence, Rivera reaches the *opposite* factual conclusion – all three are

liable.

> Later in his report, Rivera explicitly cited a legal standard to support his opinion:

>> [b]ased on the totality of material and having conducted an analysis
>> using the prongs established in [*Graham v. Connor*, 490 U.S. 386
>> (1989)] I opine that the force used by Elizabeth Police officers
>> Carrie Scharpnick, Grisel Arias, Alexander Blanco and Franklin
>> Banos was unnecessary and therefore excessive. The arrest and use
>> of force upon Nakiki Holliday was a foreseeable and preventable
>> occurrence.

*Id.* at ¶ 146.

The Court finds that the conclusions in Rivera's report regarding hotly disputed facts as to

what happened in the club parking lot between Plaintiff and Scharpnick are not subject to expert

testimony; they are classic factual issues for the jury to decide. Because those improper factual

findings are the basis for his opinion as to Scharpnick, his opinion is inadmissible. Rivera's

testimony is also excluded because it improperly opines on the correct legal standard. *See Patrick*

*v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) (upholding a district court's exclusion of expert

testimony that "essentially opined that [an officer's] actions were unreasonable and about what a

reasonable officer would have done" because "[i]n a § 1983 suit, 'reasonableness' is practically

interchangeable with 'excessiveness'"); *Holman Enterprises v. Fid. & Guar. Ins. Co.*, 563 F. Supp.

2d 467, 472 (D.N.J. 2008) (disallowing an expert's report because his "conclusion implies some

level of legal analysis on his part, and does not assist the factfinder toward resolution of the issues."). Therefore, Defendant Scharpnick's request to exclude Rivera's expert report is granted.

## V. CONCLUSION

For the reasons set forth above, the motions for summary judgment made by Defendants Arias (D.E. 76), Banos (D.E. 71), Blanco (D.E. 78), Shannon (D.E. 75), and the City of Elizabeth (D.E. 75) are **GRANTED**. Defendant Scharpnick's motion for summary judgment (D.E. 74) is **DENIED** except it is **GRANTED** as to the Count Two and Count Nine (as it pertains to failure to intervene). Scharpnick's request to bar Plaintiff's expert report (D.E. 74) is **GRANTED**. All other Defendants' requests to bar Plaintiff's expert report are dismissed as moot. An appropriate Order accompanies this Opinion.

Date: February 20, 2018

John Michael Vazquez, U.S.D.J.